All right, our next case this morning is number 161510, Trusted Knight Corporation v. IBM. Mr. Duffman. Yes, you may proceed. Thank you, Judge Iken. May it please the Court. This is a case about malicious software, otherwise known as malware. Bad actors use malware techniques known as key logging to steal confidential information and then frequently money or other assets. This is a case also where the specification teaches what the claims mean. And if I may, I'd like to start with the in response to term. The disputed term in context is in response to the software. Key logging through the API stack to an internet communication support. Now that term does not say anything about presence or detection, nor should that be read into the claim. In fact, the specification is absolutely clear that it's quite the contrary. The patent explains the solution. Isn't that the whole problem here? You've got a claim limitation that seems kind of plain on its face and a specification that says just the opposite. And so that's what seems to be the problem here with respect to why the district court below held that the claims were indefinite. Because you've got a limitation saying X and then the specification saying just the opposite. With all due respect, Your Honor, it all depends on what in response to means. This is not a case that, for example, my adversary relies on, like Allen Engineering, where the claim says there's a conflict between parallel and perpendicular. The question is what does in response mean? And in this case, the only way we know is by reading the specification. The specification says the solution of the present invention does not depend on detection of malware at all. And more importantly, the specification doesn't explain the in response to language. If I recall correctly, that language doesn't appear in the specification at all. That's correct, Your Honor. But under the cases of this court, including the cases that we cite here, Eidos and the others, it doesn't have to. What you have to do is say, will a positive understand in the context of the specification what the claims mean? The problem is in response to is just plain language that has a very accepted meaning. And you're asking us to look to the specification to find that it has a very different meaning. But, Your Honor, the issue is when you say in response to has a plain meaning. A plain meaning in what context? This is not a case about what you and I, if we were having a conversation outside this courtroom, might mean by in response to. The question is what does a positive read this to be? And the only way we know what a positive reads this to be is if you look at what the specification says. I think that... Well, it's really a question, it's not so much what in response to means, it's a question of what the object of in response to is. Whether it's talking about a malware invasion or it's talking about a threat of a malware invasion. And the problem is on, would you agree that's the question? I think that gets to the question and that also gets to the next point I wanted to make, Judge Dyke, which is that the specification also says the background of the invention discloses a prior art method. But why do we go to the specification if the in response to term is in the claim, wouldn't we go to see within the claim what in response to refers to? It seems to me that when you do that, you end up having two different options. One or both can apply or neither of them can apply. The answer to that question again is in the specification and if I may, I'd like to go back to Judge Dyke's... You're avoiding my question. Why isn't the answer in the claim? Why don't we look at the claim first to see what in response to means? This is a classic case, Judge Reyna, where the claim needs to be read in the context of the specification. There are many, many claims that this court has allowed as definite where you don't get the answer in the claim, you have to go to the specification. Okay, but let's look at the claim first. Is the answer in the claim? The answer is not in the claim. You have to go to the specification to find the answer. Well, on the face of it, the claim seems to say in response to means in response to a malware invasion, right? Absolutely not, Your Honor. And again, I'm very eager as I've been for the last couple of minutes, if I may, Your Honor, to read the next extract from the specification because the background of the invention discloses a prior art method, but the specification specifically says that method does not effectively protect users against forever threats. Where are you reading? Your Honor, this is 829. Okay. We're at an 829. An absolutely critical part of the specification. Which column? 829, Your Honor, column 3, lines 28 to 30. So the word threat is not made up. It's right there in the specification. And what's so important is this is not just a word at random. This is talking about why this is such an important invention. How does that answer the question that we're dealing with? Well, I think it answers Judge Dyke's question about are we talking about an invasion or are we talking about a threat. And the reason this is such a valuable invention is because it does talk and – So let's say that the specification, you're saying that this refers to it as a threat or an invasion? A threat, Your Honor, not an invasion. But the claim can also be read to relate to in response to as an invasion. But, Judge Rayner, read by whom? And it has to be read by a positive. And I go back to saying we all use in common speech in response to. It's a little bit more difficult than some of the cases in front of this court in the computer area where it's highly technical. You would not use that phrase on the street. Wouldn't a person skilled in the art read in response to and say, I wonder what that refers to, and then go right back up to the beginning of that claim and see if the answer is there. And even so, let's say that, yes, this part of the specification makes a reference, you say, but you're avoiding the question that I'm asking. Doesn't the claim itself refer to both a threat and the attack? Absolutely not, Your Honor. There's no basis to think that. What you do if there's a question about what the claim means, as this court has said in any number of cases, is you go look at the specification. And you also go look at the purpose of the invention. I mean, if threat was just a random word that was used in the specification, I would understand Your Honor's question. But in this case, since the invention does not depend on the detection of malware or a malware invasion, to use your term, Your Honor, it's a substantial improvement on software products designed only to detect and disable malware. We live in a world in which malware is an enormous problem. And as I said in the hearing below, and quote myself if I may. Your problem, it seems to me, is the public notice function of the claim language, which on the face of it seems to be pretty clear. It may be contradictory to the purpose of the invention, which is why we've got an indefiniteness problem. But on the face of it, it seems to be very difficult to read this claim language as referring to a threat rather than an actual invasion. No? I don't think so, Your Honor, because if there's any confusion about, as you put it, Your Honor, about whether or not in response to means an invasion or a threat, one looks at the specification. And the specification lays out, first of all, uses the word threat, and also points out that the whole point of the invention is to give people better protection. I said below when I was... Isn't your invention, your invention works in two ways. One, if there's just a threat, and one if there's an actual invasion, right? I mean, if there is an actual invasion, your invention will, your software will work. I mean, I think your specification might disclose both in the event of a threat and in the event of an invasion. No, Your Honor, because the whole point of the invention is that the software is always running to protect against a threat, and whether the threat turns into a reality, it really doesn't make any difference. But what if it does become a reality? And then the software is designed to prevent the invasion, but that does not mean that it does not make the claim indefinite, because the specification is stating that we have a big problem. What do we do about it? Do we wait to get attacked, or do we take care of it and not wait until the moment of attack? So in this situation, if you have the guard against the threat, yes, you also have the guard against the invasion, but that does not make the phrase in response to indefinite, or does not cause the claim to be indefinite on account of that. What it simply does is to say in response to what. I think it's also helpful to consider what action is performed, and that was something that the district court, I think, struggled with because the district court did not look at what the specification said. The claim limitation proceeding. Your problem is that these claims are badly drafted, right? I mean, if you meant to say threat, it should have said threat, and if it meant to have the word is in claim, what is it, 22, the word is would have been there. It's just not a well-drafted claim, and the question is what are the consequences of that? I think that's absolutely right, Your Honor, but there are many, many cases beginning with the Supreme Court decision on Nautilus and also the decision from this court on remand where the courts say claims don't have to be perfectly drafted. As this court said on remand, there's a bargain that's made between promoting inventiveness and encouraging inventiveness on the one hand and perfection of claims. The claim doesn't have to be perfect. Under multiple cases beginning with the Supreme Court decision on Nautilus, the issue is whether or not, with the benefit of the specification, a positive can understand the claim. Let's go back to understanding the claim because now I'm having a hard time understanding your argument. You're saying that the software works for purposes of a threat. Does it also work for purposes of an invasion? Your Honor, it's there to protect against a threat. But does it work in response to an actual threat? And it does, right? If there's an invasion, the software goes into operation and takes certain steps. No, Your Honor, the whole point is that the software is already operating in response to the threat. The operation doesn't change depending on whether there's an actual invasion or not. It does not because the point is that what gets the software going is simply installing it because of the threat. Whether or not there's an invasion is immaterial to the software. Whether there's a threat is the whole purpose of the software. Once there's a threat and the threat is detected, does the software shut down? Your Honor, it's always running. It doesn't detect threats, right? It's in response to the threat. Another way to say it, Your Honor, is... Wait, wait. It doesn't detect actual invasions, right? That's correct. And the operation doesn't change depending on whether there's an actual invasion. It's always running. It's always running. It doesn't respond to the actual invasion. It doesn't have to because it's already always running in response to the threat. What happens? Surely the software does more than just simply notify or identify a threat. It takes action against malware. It doesn't even notify, Your Honor. No, no, no. I know that. I know it doesn't do that, but it does more than just sit there and wait to detect a threat. It's always running so that whether or not... Once the actual invasion occurs, then the software also has steps that it takes. No, Your Honor, because the software, when installed, does the following. And this is why the what part is so important that I was trying to get to. The action that's performed is submitting the keyed-in data while clearing the confidential data. That's always happening. So data gets inputted, and the software, my client's software, will always take that software, will always encrypt it, will take it through the level three area, which is the area where the malware is operating, and it will always deposit unencrypted data where it should be, for example, a bank browser. That's always happening. It's always happening because of the threat. And that process, which I just described, in no way varies if there's an invasion. The software doesn't care if there's an invasion. The software is taking these three steps. Your point is that it's going to take those three steps, and it's going to move the data, so it's not in response to key logging. Exactly right. I understand your position. I still have a problem because your claim specifically says in response to the key logging. And as Judge Reyna pointed out, you look at the claim and you see in response to, and then you look at what comes after that language to try to figure out what it's in response to. And then your specification says something different. I don't see how you make them consistent. Well, but, Your Honor, as I said at the beginning, it doesn't say in response to detection. It doesn't say in response to presence. If you want to know what it's in response to, then you've got to look at it. It does say it's in response to the software key logging through the API stack, which when I look to your specification, that's talking about malware action. And key logging and malware are exactly the same thing, Your Honor, under the terms of art here. I'm sorry, Your Honor, key logging is not re-inputting. Key logging is another synonym for malware. Yes. So it says in response to the software key logging or, as you would say, in response to the malware. Yeah. In response to the malware, this program will always do, take the inputted key strokes, it will always encrypt them, take the data safely through the level three area, deposit it in, for example, a bank browser, and unencrypt it. It always will do that in response to the threat, and threat is the word in the specification, will always do that. It doesn't care whether there's an invasion or not. That's what it will always do. Your Honor, I think we're out of time here. Mr. Gupta, we'll give you two minutes for a rebuttal. Thank you, Your Honor. Okay. Mr. Nelson. Thank you, Your Honors. Good morning. Dave Nelson on behalf of IBM. So let me just address the question Your Honors were asking about whether the specification discusses actions taken in response to malware, and it certainly does. I mean, for example, in column four, which is a summary of the invention about lines 47, it says the present system detects attempts to place hooks by techniques such as modification of important tables or the insertion of inline hooks. Line 47? Correct, Your Honor. 47 to 49, I believe it is. So there's a reference there where there are specific actions that are taken. Was it column four? It's in column four in the summary of the invention, taken in response to malware. Another example in response to Your Honor's direct question about whether there are things that are done when malware is detected, if you look at column six about line 39 through 41, it specifically says, in describing various aspects of the invention, the software program further comprises a module for detecting malicious behaviors of a known malware and a module for removing the malware. Similarly, if we start with that one, that was in column six, Your Honor, line 39 to 41. So is the module for removing the malware, is that referenced in the claim? Well, that's exactly part of the problem, Your Honor, because it does. The claim references, and if I just refer to the in response to claim first, which is one in 23, I believe. In response to in the parlance of computer system technology has a meaning, and frankly in general parlance has a meaning too, and it has a meaning that's not modified by this specification, which is there is an action and that causes something else to happen. That's what in response to means, and that's the problem with this claim, because it says very specifically that there is one of the steps, the last of the three steps that are described in the process, that there's a process consisting of two separate events. I understand counsel's argument that there's the word while, so one happens while another happens, but that doesn't change the fact that there are two different events. They're numbered that way in the claim. And I can do two things in a computer system or in life at the same time. Two things can happen at the same time. It doesn't make them the same event. So then the language goes on and says very specifically that in response to the software key logging through the API stack to an internet communication port. So that doesn't tell me in that particular claim or in the specification anywhere that action, the in response to, what is it taken in response to? What is the triggering event for that? That's never discussed anywhere in this specification, never laid out in this specification, and therefore we don't know what it means. I think what you're saying, if I understand correctly, is the specification is itself conflicting. In some places it says that it is in response to actual malware, those two examples that you gave us just now. In other places it says it doesn't depend on detecting. Well, that's correct. That is correct, Your Honor. And that goes back to the public notice function because those, if I just take those broadly, those are two very different claims, right? One is a system that does certain things when malware is present and takes certain action. And another one is that it doesn't do those things. Now, what other ramifications that has with respect to divided infringement or things, well, that's not what we're here for today. But those are two very different scopes. It's kind of a weird case in a way to me in the sense that it seems as if this limitation could possibly be interpreted narrowly to actually mean what it says in response to software key logging. Or it could be indefinite as a result of the specification being inconsistent. Did you have different arguments below? We didn't make different arguments below with respect to this, Your Honor. We could have, and we considered those things. And I understand what Your Honor is saying. And part of the further problem on the specificity question that Your Honor just asked is software key logging is actually a specific form in this patent. Because if you go back to the beginning of the patent where it's talking about the various forms of attacks that it's trying to protect against, it doesn't equate software key logging with malware. Are you looking at a particular column? Yes, I am, Your Honor. I apologize. I'm looking at column one, for example. And this would begin the discussion of software key logging begins at line, I believe, 61. And you'll see that there's a description of software key loggers and how they attack and what they do. But then there's other techniques described. For example, in column two, line five, another one relevant to these claims, it says another technique is hook-based key logging. So software key logging, hook-based key logging are not the same thing. Yeah, but each is an example of malware. Each is an example of malware, Your Honor. But remember, their argument is that the in-response-to language, and if I read that language again, just to remind myself, it says in response to the software key logging through the API stack to an Internet communication port. Now, software key logging cannot refer to the presence of malware generally because the patent doesn't equate the two. Okay, but so they say it's responding to the threat of this particular kind of malware. Does this claim make sense if it's read literally? In other words, to say that this happens when there is an actual invasion of software key logging? No, it doesn't make sense in light of the specification, Your Honor, because there is no description of such function. So just to go back, let's just accept their argument and set aside that we're talking about a specific form of malware here. If we say it's in response to the threat of malware, one, we don't know which of these two are in response to that. That seems to me not to get you anywhere because on the face of it, it's talking about a specific kind of malware. I apologize, Your Honor. When I said which of these two, I meant the two steps in that last thing of the claim where it says one and two, the process of submitting and the clearing. So I apologize for that ambiguity. But there are two other steps. And in the specification, if I just accept their argument and talk about malware generally, all of those things would happen in response to the threat. They're all part of the same thing. So a claim that tries to refer to a specific form of malware and a specific action taken with response to only one of those threats doesn't make any sense in light of the specification. So there's no description to one of ordinary skill in the art of what would be that triggering event. Do you have another argument besides that one? Besides? Do you have another argument besides that one? I mean, I think that some of your other arguments on indefiniteness are better than saying I can't tell which phrase this is modifying. No, understood, Your Honor. You're talking about which phrase either one or two. That's what I understood you to be talking about. And you were also saying it seems like this step would be in response to everything that's done in other parts of the claim, so you can't tell what it's modifying. I think that's what you're saying. And I guess I just was saying that do you have another argument? Because that one, to me at least, isn't the real reason why there's indefiniteness here. No, the most direct reason why there's indefiniteness, and this goes back to the claim language, because my understanding of the case is, yes, you read the claim language in light of the specification. You don't discard the claim language and say I'm just going to go to the specification and rewrite it and figure out what it means. And here the claim language is specific. And if we look at the last element, it says a process of, one, submitting the keyed-in data to a designated entity through the API stack, while, two, clearing confidential data from intercepted data at the zero-ring level prior to a subsequent transmission, which does not contain said confidential data in response to the software key logging through the API stack to an Internet communication. So let's say that I read in response to that it could be either one or two or both. But the fact that it's set out in the claim, would that make it, do we still have an indefiniteness issue? We do have an indefiniteness issue. Because it's specifically telling you it's one or both. Here they are. This is in response to number one or two. And the arguments that I hear is that we have a problem here because it doesn't tell you which, and both of them could apply or neither of them could apply. Well, that doesn't make, it doesn't make sense in response, excuse me, it doesn't make sense in response to language in light of the claim itself. Right? Because there needs to be, when it says it's in response to, it needs to be in response to something. There has to be some triggering event. It could be one or two. It could be threat or. But that's not what the claim says, Your Honor. And the specification doesn't help us with that. And that's not their argument either. It isn't their argument. And just to go back to the public notice function, the problem with that is it doesn't, the claim language does not say that. If there were a description in the specification that was very clear, then maybe we would have a different case. But the problem is we're left with somebody writing an ambiguous claim, and just to take Your Honor's example, that could go out there and now try to enforce the claim, seeing what people are doing and saying, Well, what I really meant is one or two. Or what I really meant was only one and not two, depending upon what that prior art is. And that's the problem with the public notice function with these cases, or excuse me, with these claims, is that at the time when you're doing your bargain with the patent office, you've got to make your decision. You've got to make your decision of what the scope of your claim is, write that in clearly so people of ordinary skill in the art are placed on notice. Not have some kind of ambiguous claim that's still ambiguous, in light of the reading in the specification, since they can't point to any language in the specification where that in response to is described. So it's just a specification that said the invention here is encryption or some other software process that protects the data, and it's designed to act in response to threats of malware. Then that might lead to the kind of interpretation that they're talking about, but you're saying that the specification isn't clear enough to lead to that interpretation. Correct, Your Honor. That may be a closer case. That isn't this case here. As I said, there are examples of things being done when malware is actually present and detected, and there are ones that are when it's not there. But in addition, we would still have the problem of software key logging, setting aside the fact that there are different types, being a specific act. It's something that's out there, and in fact, the rest of the language implies that even more, because it's through an API stack to an Internet communication port. In other words, it's not a generic statement. If the intent was to say, I'm doing all of this in response to the threat of malware, that's a very easy thing to say, right? But to attempt to perhaps write a narrower claim, and I don't know what was in the minds of the patentee when they were in front of the patent office, and then come in and say, well, what I really meant is go ahead, court, and fix this, to say I was just referring to essentially what would be throwaway language now, and all this works in response to the threat of malware isn't consistent with the public notice function. So what's an API stack? The API stack, I think we had an agreed upon definition, and I can give that specifically. Okay. Basically, it's the set of APIs that would be used for particular applications. Most commonly be provided by the operating system, but not always necessarily provided by the operating system. So things like accepting keystrokes and basic functions? Yeah, correct. I mean, you can have those things. Oftentimes, something at that level, which would go to the hardware level, would actually be taking care of what I would call below the level of APIs, maybe at a more privileged access level, but it would be those types of things. Can you give a couple more examples for the court? Sure. An example of an API may be something to transfer information or get information from a particular form if we take the input from the application to take these particular fields so that I can encapsulate those things in packets and send those out. Things like that would be handled through APIs. Typically, it's a division when you have an API would be a division in the programming so that the operating system, for example, and the underlying software may provide functionality. The application itself doesn't need to provide that same functionality to write all that code and repeat all that code. It can just make a call to the operating system and say, do this for me. So that's generally what we're talking about here. But again, on that particular point, if I go back to that language that I read in column four, the in-response-to language, the software key logging through the API stack to an internet communication port, that wouldn't be the only way that the software-based key logging works. That's why I say it's a very specific form that's in the claim because you see that in column four, that language I read at line 47, the present system detects attempts to place hooks by techniques such as modification of important tables or the insertion of inline hooks. So there can be other things, modifying the operating system tables and things like that, which again leads one of ordinary skill in the art to the point that what is written in this claim is very specific, isn't just a general statement about a threat. Okay. Thank you, Mr. Nelson. Thank you, Your Honor. Mr. Gupta, you've got two minutes. Yes, Your Honor. I just want to cite two cases. I don't think this patent should be held to a higher standard than this court has held many, including EDOS. EDOS, as Your Honor will recall, talked about a contact hole, a contact hole, and the debate was does that mean a single contact hole or separate and distinct contact holes? And the court correctly found, based on the specification, that it meant something totally different than the common ordinary English meaning would have it. I can't say it any better than you did, Judge Dyke, in your dissent and strike path, where you said, if I may, we must look to the specification as a single best guide to meaning of a disputed term, even in cases where language on its face appears to have a plain meaning, because as Phillips states, the specification is always highly relevant to the claim construction analysis. The only meaning that matters, the only meaning that matters is the meaning in the context of the patent, and that's why the test is the posita. I don't have a lot of time to rebut every one of Mr. Nelson's citations. Can you rebut his argument that the specification is inconsistent? It is not inconsistent. I think there were a lot of irrelevant citations to the specification, Your Honor, and they don't relate. Irrelevant language, you mean, when it talks about detecting malware? Detecting malware in that context is not related to this limitation. Yes, the word detecting exists, but not in the context of in response to. You're saying that's maybe a separate embodiment? Totally separate, totally separate, Your Honor. But there's no claims that do that, right? Claims 1 and 23 and 22 do not do that. But are there claims that do, that act in response? Not claims that are being asserted in this case, Your Honor. In the patent. In the patent. Are there any claims that operate in response? No, there are not. There are not. The relevant part, again, of the specification is where the specification specifically says it does not depend on detection or malware. It talks about threats, and so I guess the last point I make, if I could, is Mr. Nelson's boogeyman of, okay, we could broaden this patent, apply it as we see fit, as we look at litigation possibilities. That's totally untrue. What we have here is a solid record about what exactly this patent does and the limitations of what the patent does. Okay. Thank you, Mr. Gupta. I thank both counsel. The case is submitted.